UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Lisa D. Williams,

                                    Plaintiff,

                    v.

Commissioner of Social Security,

                                    Defendant.

_____

**Decision and Order**

19-CV-44 HBS
(Consent)

## I.    INTRODUCTION

The parties have consented to this Court's jurisdiction under 28 U.S.C. § 636(c).  The Court

has reviewed the Certified Administrative Record in this case (Dkt. No. 7, pages hereafter cited in

brackets), and familiarity is presumed.  This case comes before the Court on cross-motions for

judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  (Dkt. Nos. 9,

11.)  In short, plaintiff is challenging the final decision of the Commissioner of Social Security (the

"Commissioner") that she was not entitled to Supplemental Security Income under Title XVI of the

Social Security Act.  The Court has deemed the motions submitted on papers under Rule 78(b).

## II.    DISCUSSION

"The scope of review of a disability determination . . . involves two levels of inquiry.  We

must first decide whether HHS applied the correct legal principles in making the determination.  We

must then decide whether the determination is supported by substantial evidence." *Johnson v. Bowen*,

817 F.2d 983, 985 (2d Cir. 1987) (internal quotation marks and citations omitted).  When a district

court reviews a denial of benefits, the Commissioner's findings as to any fact, if supported by

substantial evidence, shall be conclusive.  42 U.S.C. § 405(g).  Substantial evidence is defined as

"'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Tejada v. Apfel*, 167 F.3d 770, 773-74 (2d Cir. 1999).

The substantial evidence standard applies to both findings on basic evidentiary facts, and to inferences and conclusions drawn from the facts. *Stupakevich v. Chater*, 907 F. Supp. 632, 637 (E.D.N.Y. 1995); *Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994). When reviewing a Commissioner's decision, the court must determine whether "the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Winkelsas v. Apfel*, No. 99-CV-0098H, 2000 WL 575513, at *2 (W.D.N.Y. Feb. 14, 2000). In assessing the substantiality of evidence, the Court must consider evidence that detracts from the Commissioner's decision, as well as evidence that supports it. *Briggs v. Callahan*, 139 F.3d 606, 608 (8th Cir. 1998). The Court may not reverse the Commissioner merely because substantial evidence would have supported the opposite conclusion. *Id.* "The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and citations omitted).

For purposes of Social Security disability insurance benefits, a person is disabled when unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous

work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

Plaintiff bears the initial burden of showing that the claimed impairments will prevent a return to any previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether any plaintiff is suffering from a disability, the Administrative Law Judge ("ALJ") must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing past relevant work; and

(5) whether the impairment prevents the plaintiff from continuing past relevant work; and whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, *supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry then the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). However, the ALJ has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing past work, the ALJ is required to review the plaintiff's residual functional capacity ("RFC") and the

3

physical and mental demands of the work done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e).

The ALJ must then determine the individual's ability to return to past relevant work given the RFC.

*Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

Plaintiff challenges the ALJ's determination that she did not meet the criteria of Listing

12.05(B). The ALJ found that plaintiff had the following severe impairments: post-traumatic stress

disorder ("PTSD"); a depressive disorder; an anxiety disorder; an intellectual disorder vs. borderline

intellectual functioning; a learning disorder; chronic obstructive pulmonary disease ("COPD"); and

asthma. [18.] After finding that plaintiff did not meet any medical listings, the ALJ found that

plaintiff had the RFC for medium work with a number of non-exertional limitations. [24.]

According to plaintiff, consultative psychologist Dr. Janine Ippolito evaluated her on several

occasions and found limitations that would satisfy Listing 12.05(B):

> Plaintiff was seen on May 23, 2013 for a psychiatric evaluation by Janine Ippolito, Psy.D, related to a prior claim for benefits. Plaintiff was irritable and dysthymic, with a depressed mood. She had impaired attention and concentration, and fair to poor judgement. Plaintiff had a mild limitation to maintaining attention and concentration; moderate limitation to performing complex tasks with supervisions, relating with others, and dealing with stress. T. 252-56. Plaintiff was also seen for an internal medicine examination by Samuel Balderman, M.D. Plaintiff had no physical limitations. T. 257-61.

> On July 9, 2015, Plaintiff was seen for another psychiatric evaluation with Dr. Ippolito. Plaintiff had a moderate limitation in maintaining attention and concentration; and marked limitations in dealing with stress and relating adequately with others. T. 427-31. Dr. Balderman also performed a second internal medicine examination. She had a mild limitation in repetitive bending and lifting, and should avoid dusty environments. T. 432-40.

> Dr. Ippolito conducted another psychiatric evaluation on December 28, 2017. She was anxious, with limited attention and concentration. She had very low IQ, fair-to-poor insight, and fair judgment. Dr. Ippolito found moderate limitation in understanding and applying complex directions, making decisions, interacting with others, sustaining a routine and regular attendance; and had marked limitations in controlling behavior and maintaining well-being. T. 699-707. Dr. Ippolito conducted intelligence testing as well. Previous IQ test results were reviewed; she had a full-scale IQ of 54 and processing speed score of 50. Plaintiff was also

4

administered the TONIIV, a nonverbal intelligence measure, which fell within the
low-average range of functioning. T. 709-13.

(Dkt. No. 9-1 at 8–9.) Given the marked limitations that Dr. Ippolito found, plaintiff sees an

inconsistency in how the ALJ gave Dr. Ippolito's findings significant weight yet found that Listing

12.05(B) was not satisfied:

> Prior to the current filing, Dr. Ippolito found moderate limitations in
> performing complex tasks, relating adequately with others, and appropriately dealing
> with stress. T. 255. On July 9, 2015, Plaintiff was seen for another psychiatric
> evaluation with Dr. Ippolito opined that the Plaintiff had a moderate limitation in
> maintaining attention and concentration; and marked limitations in dealing with
> stress and relating adequately with others. T. 430. On December 28, 2017, in a
> post-hearing consultative examination, Dr. Ippolito assessed marked limitations in
> Plaintiff's ability to "regulate emotions, control behavior, and maintain well-being".
> T. 712. The ALJ collectively assigned these opinions "significant weight to the
> extent they are consistent with the medical evidence of the record as whole, in
> particular the intelligence testing performed in 2016 and 2017 and the claimant's
> activities". T. 24. However, she failed to properly assess the Plaintiff's functioning
> in light of the marked limitations found by Dr. Ippolito, both in regards to evaluating
> the Plaintiff under the listings, and in relation to Plaintiff's residual functional
> capacity. This was error. *Dioguardi*, 445 F. Supp. 2d at 298-299.

(*Id.* at 13; *see also* Dkt. No. 12 at 2.) The Commissioner responds that a consultative examiner's

opinions are not entitled to any special deference and that clinical evaluations placed plaintiff short

of all of the criteria for Listing 12.05(B):

> With respect to IQ testing, Dr. Zuckerman's September and October 2016
> testing, including the Wechsler Adult Intelligence Scale-IV Edition ("WAIS-IV"),
> yielded a Full Scale IQ score of 54, consistent with mildly to moderately delayed
> intellectual functioning (Tr. 17, 442-44). However, Dr. Zuckerman [a psychologist
> who performed an evaluation at the request of plaintiff's primary care doctor] did
> not address the validity of the test results. Dr. Zuckerman also administered the
> Wide Range Achievement Test-IV ("WRAT"), which showed below average reading,
> spelling, and math computation skills (Tr. 17, 442-444). Dr. Ippolito, who examined
> Plaintiff in May 2013, July 2015, and December 2017, noted that Plaintiff appeared
> to have below average intellectual functioning and a somewhat limited general fund
> of information (Tr. 17, 252-256, 427-431, 699-713). Plaintiff's treating sources also
> estimated that she had borderline intelligence (Tr. 17, 507-544, 565-621). Given her
> extensive adaptive functioning, her alleged poor reading skills, and the fact that the
> WAIS-IV requires reading, the ALJ ordered additional intellectual testing; and in
> December 2017, Dr. Ippolito administered the standardized nonverbal intelligence

measure, TONI-IV, that did not require reading and that yielded an IQ result of 84, which was consistent with low average range nonverbal intellectual functioning; and Dr. Ippolito assessed that these scores were valid and a reliable estimate of the claimant's current functioning. Thus, based on this evidence, Plaintiff failed to meet the first criterion of Listing 12.05B.

Additionally, the ALJ found that, notwithstanding whether Plaintiff satisfied an IQ score criterion, she failed to demonstrate that she had the requisite deficits in adaptive functioning, as the evidence showed that Plaintiff had at most moderate limitations in each of the four functional areas. Substantial evidence supports this finding.

(Dkt. No. 11-1 at 12–13.)

The severe impairments that the ALJ found and the issues that plaintiff has raised implicate special procedures in the regulations concerning mental impairments. "[W]hen we evaluate the severity of mental impairments for adults (persons age 18 and over) and in persons under age 18 when Part A of the Listing of Impairments is used, we must follow a special technique at each level in the administrative review process." 20 C.F.R. § 404.1520a(a). The regulations offer considerable detail about the process; in short, the Commissioner "will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function." *Id.* § 404.1520a(c). For any limitation rated as "moderate" or "marked," "we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the

6

appropriate listed mental disorder. We will record the presence or absence of the criteria and the

rating of the degree of functional limitation on a standard document at the initial and

reconsideration levels of the administrative review process, or in the decision at the administrative

law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a

decision)." *Id.* § 404.1520a(d). "The SSA must document application of the technique in the

decision. The regulations, however, do not require the decision to explicitly mention the technique."

*Rodgers v. Colvin*, No. 3:15-CV-1449 (JCH), 2016 WL 4432678, at *7 (D. Conn. Aug. 17, 2016) (citing

20 C.F.R. § 404.1520a(e)). Procedurally, the Court is satisfied that the ALJ applied the special

technique of Section 1520a even though she did not use the phrase "special technique" or cite the

regulation explicitly.

On substance, applying the special technique here for the issues that plaintiff has raised

requires an examination of Listing 12.05(B). Listing 12.05(B), covering intellectual disorders,

requires satisfaction of all three of the following criteria:

> 1. Significantly subaverage general intellectual functioning evidenced by a or
> b:
>
> a. A full scale (or comparable) IQ score of 70 or below on an individually
> administered standardized test of general intelligence; or
>
> b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or
> performance IQ score (or comparable part score) of 70 or below on an individually
> administered standardized test of general intelligence; and
>
> 2. Significant deficits in adaptive functioning currently manifested by extreme
> limitation of one, or marked limitation of two, of the following areas of mental
> functioning:
>
> a. Understand, remember, or apply information (see 12.00E1); or
>
> b. Interact with others (see 12.00E2); or
>
> c. Concentrate, persist, or maintain pace (see 12.00E3); or

d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05(B).

With respect to the first criterion, the record contains conflicting test scores. In 2016, plaintiff went through the Wexler Adult Intelligence Scale-IV ("WAIS-IV") intelligence test. [447.] The WAIS-IV was administered by a qualified specialist and "has a mean of 100 and a standard deviation of 15." Listing 12.00(H)(2)(a); *see also, e.g.*, Wais Score Interpretation, *available at* http://www.actforlibraries.org/wais-score-interpretation/ (last visited April 9, 2020). Plaintiff obtained a full-scale score of 54, placing her within only the first percentile. [447.] Dr. Ippolito accepted the 2016 score and did not perform it again. [715.] Nonetheless, Dr. Ippolito in 2017 performed an additional test titled the Test of Nonverbal Intelligence, Fourth Edition ("TONI-4"). The TONI-4 test is designed to "to help ensure proper representation of demographic changes in the U.S. population" and has "[s]imple oral instructions only require test-takers to answer with meaningful gestures such as pointing, nodding, or blinking." TONI-4, *available at* https://www.pearsonassessments.com/store/usassessments /en/Store/Professional-Assessments/Cognition-%26-Neuro/Non-Verbal-Ability/Test-of-Nonverbal-Intelligence-%7C-Fourth-Edition/p/100000612.html?tab=product-details (last visited April 9, 2020). TONI-4 also has a mean of 100 and a standard deviation of 15. *Id.* Plaintiff on this test scored "within the low average range of nonverbal intellectual functioning." [715.] To the extent that the two tests offered mixed results, the ALJ had discretion to resolve any conflicts within the context of the overall record. *See Michelle K. v. Berryhill*, No. 8:17-CV-405 (TJM), 2018 WL 4616033, at \*4 (N.D.N.Y. Sept. 26, 2018) (citations omitted); *Baszto v. Astrue*, 700 F. Supp. 2d 242, 248 (N.D.N.Y. 2010) (an ALJ

may reject an IQ score as invalid when it is inconsistent with the record) (citations omitted). The

problem, however, is that neither the record nor the ALJ's decision explains how any discretion to

resolve any conflicts was used. *Cf. Rivera v. Apfel*, No. 98-CV-0619E F, 2000 WL 1568596, at *3

(W.D.N.Y. Sept. 29, 2000) ("But where, as here, such scores are not inconsistent with the record and

are facially valid, neither the ALJ nor the undersigned may substitute his opinion in lieu of

competent medical analysis.") (citation omitted). Dr. Ippolito did not question the 2016 score and

yet ordered another test, a test designed for foreign-language test-takers whose "pointing, nodding,

or blinking" would seem to conflict with Dr. Ippolito's own medical source statement regarding the

ability to learn simple directions and instructions and to interact with supervisors and the public.

[715–16.] The record does not explain why the second test was ordered. Additionally, the ALJ very

well might have had a reason for picking the higher second test score over the lower first test score

but does not adequately explain what that reason is.

With respect to the second criterion of Listing 12.05(B), the record again contains mixed

evidence. In 2013, Dr. Ippolito assessed plaintiff's mode of living as follows:

> The claimant notes that she is able to do cooking, cleaning, laundry, and
> shopping on a daily basis with assistance from her boyfriend. She reports that she is
> able to shower, bathe, and dress herself independently. She states that she manages
> her own money with assistance from her boyfriend. She notes that she does not
> drive due to lack of driver's license. She also states that she does not take public
> transportation and chooses not to due to discomfort being around people.
> Socialization: She reportedly interacts with her boyfriend regularly. Family
> relationships: None reported. Hobbies and interests include watching TV. The
> claimant reportedly spends a typical day watching TV, showering, and sitting on her
> porch.

[259.] Staying within Dr. Ippolito's own evaluations, since the ALJ gave them significant weight, the

evaluation of mode of living seems to have deteriorated somewhat by 2015:

> The claimant reports that she is able to do cooking, cleaning, showering,
> bathing, and dressing independently. She reportedly does not do laundry and needs
> to be accompanied by her boyfriend when doing grocery shopping. The claimant

reports that she does not manage money and her boyfriend is responsible for household finances. The claimant reportedly does not drive due to lack of driver's license. She also does not use public transportation due to her anxiety. Socialization: None reported. Family relationships: None reported. Hobbies and interests include watching TV. The claimant spends a typical day watching TV and running errands with her boyfriend.

[433–34.] By 2017, Dr. Ippolito appears to have downgraded plaintiff's mode of living a little further:

> She reports that she is able to do cooking, cleaning, showering, bathing, and dressing independently. She currently does not do any laundry or grocery shopping. Her boyfriend does laundry. She states that she does not do shopping because she gets frustrated easily dealing with people. She also reportedly has difficulty managing money. Her boyfriend is responsible for household finances. She does not drive due to lack of driver's license, and she does not use the public transportation. Socialization: She interacts with her boyfriend only. Family relationships: She keeps in touch with her sister and brother. Hobbies and interests including watching movies and fishing. She spends a typical day isolated in her room watching TV and laying with her dog.

[715.] Perhaps in recognition of a deteriorating mode of living, Dr. Ippolito in 2017 stated explicitly that plaintiff "can regulate emotions, control behavior, and maintain well-being *with marked limitations*. These limitations are due to her emotional distress and cognitive deficits. The results of the evaluation appear to be consistent with psychiatric and cognitive problems, and this may significantly interfere with the claimant's ability to function on a daily basis." [716 (emphasis added).] From Dr. Ippolito's evaluations, plus the clinical notes that plaintiff has cited in the record, two problems become apparent regarding the second criterion of Listing 12.05(B). First, Dr. Ippolito explicitly used the phrase "marked limitations" but with language that potentially could be applied to any of the four subparts of the second criterion. Second, the mode of living that Dr. Ippolito described by 2017 contrasts with other cases that featured a higher degree of independent living and activity, and compares with cases featuring similar limitations. *Cf. Burnette v. Colvin*, 564 F. App'x 605, 607–08 (2d Cir. 2014) (summary order) (Listing 12.05(B) not satisfied where plaintiff

"reported graduating from high school without special education classes, maintaining a job for some time after high school, and briefly attending college. Additionally, although she reported sometimes needing help with cooking, cleaning, and laundry, she has nevertheless been able to live alone, obtain a driver's license, take public transportation, shop for food, and pay her bills."); *Sprague v. Comm'r*, No. 1:18-CV-666-DB, 2019 WL 4059004, at *7 (W.D.N.Y. Aug. 27, 2019) (Listing 12.05(B) not satisfied where, *inter alia*, "[t]he ALJ also noted that Plaintiff was able to concentrate, persist, and maintain pace well enough to read novels; graduate from cosmetology school; and take care of his parents. Plaintiff also passed the time playing video games and writing poetry. Additionally, Plaintiff applied for jobs (although he did not get any because of his criminal background), indicating he believed he had the capability of focusing his attention on activities and stay on task."); *Storms v. Comm'r*, No. 5:14-CV-01020, 2016 WL 1057044, at *5 (N.D.N.Y. Mar. 14, 2016) (remand where, *inter alia*, "the ALJ does not mention that Plaintiff worked closely with, and required assistance from, the Onondaga County Department of Social Services and the New York agency, Office of People with Developmental Disabilities, while raising his two sons because of 'deficits in his parenting and life management skills'").

Under these circumstances, any conclusion that plaintiff does not satisfy Listing 12.05(B) requires additional explanation. In ordering remand, the Court makes clear that it expresses no opinion as to how additional explanations should look or what the ultimate determination of disability should be. At a minimum, the favoring of one intelligence test score over another, when consultative examiners accepted both as valid, requires further discussion. Also, some additional explanation is necessary as to why a clinical examiner was given "significant weight" across three examinations over four years except, it seems, for the phrase "marked limitations." The Court

11

declines to address any other issues that the parties have raised.  Upon remand, the Commissioner is free to revisit those issues as might be appropriate.

## III.    CONCLUSION

For the above reasons, the Court denies the Commissioner's motion (Dkt. No. 11).  The Court grants plaintiff's cross-motion (Dkt. No. 9) in part to vacate the Commissioner's final decision and to remand the matter for further proceedings consistent with this Decision and Order.  The Court denies plaintiff's cross-motion to the extent that it seeks any other relief.

The Clerk of the Court is directed to close the case.

SO ORDERED.

__/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: April 14, 2020